**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Dominic Phillip BROOKLIER, Samuel Orlando Sciortino, Louis Tom Dragna, Michael Rizzitello, and Jack Locicero, Defendants-Appellants.**

Nos. 81–1045 to 81–1049.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 5, 1982.
Decided Sept. 3, 1982.
Rehearing and Rehearing En Banc
Denied Nov. 1, 1982.

of the claim here may help to clarify the relationship of the available remedies.

Anthony P. Brooklier, Marks & Brooklier, Beverly Hills, Cal., for Brooklier.

Donald B. Marks, Marks & Brooklier, Beverly Hills, Cal., for Sciortino.

Donald Re, Weitzman, Fidler & Re, Los Angeles, Cal., for Dragna.

Howard W. Gillingham, Los Angeles, Cal., for Rizzitello.

Terry Amdur, Pasadena, Cal., for Locicer.

James D. Henderson, Sp. Atty., Los Angeles, argued, for plaintiff-appellee; Andrea Sheridan Ordin, U. S. Atty., Los Angeles, Cal., on brief.

Before KENNEDY and SCHROEDER, Circuit Judges, and SOLOMON,* Senior District Judge.

PER CURIAM:

Appellants are members of La Cosa Nostra, a secret national organization engaged in a wide range of racketeering activities, including murder, extortion, gambling, and loansharking. They appeal their convictions for violating the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. § 1962 and the Hobbs Act, 18 U.S.C. §§ 1951(a) and 2.

At a seven-week trial, the government showed that beginning in 1972, members of the Los Angeles "family" extorted money from pornographers and bookmakers. Among their targets were Sam Farkas, Theodore Gaswirth, and Reuben Sturman. They also obtained money from Forex, an FBI-operated pornography business.

Much of the evidence consisted of testimony by extortion victims, including the FBI agents who ran the Forex operation. Aladena "Jimmy the Weasel" Fratianno, an FBI informant, described the internal organization and operations of La Cosa Nostra as an ongoing enterprise engaged in racketeering. Fratianno gave details on meetings, orders, and actions of the entire organization, including plans to murder Frank Bompensiero, an informant. He linked the individual acts of extortion to the leaders of La Cosa Nostra.

The indictment charged Brooklier, Sciortino, Dragna, Locicero, and Rizzitello (appellants) with racketeering in violation of RICO,[1] extortion,[2] obstruction of justice,[3] and aiding and abetting.[4]

---

* Hon. Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

1. 18 U.S.C. § 1962(c) & (d) provide:
 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section. "Enterprise" and "pattern of racketeering activity" are defined in 18 U.S.C. § 1961(4), (5):
 (4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;
 (5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

2. 18 U.S.C. § 1951 provides, in part:
 (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
 (b) As used in this section—
 * * * * * *
 (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
 (3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

3. 18 U.S.C. § 1510 provides, in part:
 "Whoever injures any person in his person or property on account of the giving by such person or by any other person of any such information to any criminal investigator—

4. See note 4 on page 1214.

Count 1 charged all five appellants with conspiracy to commit RICO; the jury convicted all except Sciortino on this count. Count 2 charged all the appellants with a substantive violation of RICO; the jury convicted all of them. Count 3 charged that all appellants extorted money from Theodore Gaswirth and from his pornography business; all of the appellants were acquitted on this count. Count 4 charged appellants Rizzitello and Locicero with extorting money from Forex; the jury convicted both of them. Count 5 charged Brooklier, Sciortino, and Dragna with obstruction of justice through the murder of Frank Bompensiero, an informant; the jury acquitted all of them on this count.

Most of the issues raised on appeal challenge the racketeering acts on which the RICO convictions are based. The convictions on Count 1 are based on the racketeering activities charged in Counts 3, 4, and 5, and the extortion from Reuben Sturman and the Sovereign News Company in Cleveland, Ohio. The convictions on Count 2 are based on the same activities as Count 1 and the extortion of money from San Farkas in Los Angeles, California. The RICO counts allege that each of the defendants has engaged in, or conspired to engage in, at least two acts of "racketeering," as that term is defined by 18 U.S.C. § 1961(1).

## I.

## DOUBLE JEOPARDY

In 1974, Dominic Brooklier and Samuel Sciortino were indicted for RICO violations. The indictment included a charge that in 1973, they conspired to conduct an

extortion ring. One specific charge alleged that they conspired to extort money from Sam Farkas, and several specific acts by which they extorted money from Farkas were cited. In April, 1975, based on a plea agreement, Brooklier and Sciortino pleaded guilty to this conspiracy count; the other counts were dismissed.

In 1978, Brooklier and Sciortino were again indicted. Count 2 of the new indictment charged a RICO violation, but unlike the 1974 indictment, they were charged with a violation of a different subsection.[5] Although most of the charges in the 1980 indictment refer to acts which occurred after the 1975 conviction, one of the acts was the same act set forth in the 1974 indictment to which those appellants pleaded guilty. It charged they "extorted and caused the extortion of United States currency from Sam Farkas."

Brooklier and Sciortino moved to dismiss the Farkas incident in Count 2 on the ground of double jeopardy. The district court denied the motion and appellants filed an interlocutory appeal. This court affirmed the district court and held under *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), there was no double jeopardy. *United States v. Brooklier*, 637 F.2d 620 (9th Cir. 1980).

Although we have discretion to modify this interlocutory decision, see *United States v. Snell*, 627 F.2d 186, 188 (9th Cir. 1980), we decline to do it. *Blockburger* permits the government to charge the defendants with two or more offenses arising from the same transaction when the offenses have distinct elements. Under *Blockburger*, if appellants had not been indicted and convicted in 1974, the govern-

---

Shall be fined not more than $5,000, or imprisoned not more than five years, or both.

4. 18 U.S.C. § 2 provides:
(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

5. The 1974 indictment charged these appellants under 18 U.S.C. § 1962(d), which makes it unlawful to engage in a conspiracy to conduct an extortion ring. The 1980 indictment charges the appellants with violation of 18 U.S.C. § 1962(c), which makes it unlawful to participate in an enterprise affecting interstate commerce through a pattern of racketeering activity.

ment in the 1980 indictment could have charged Brooklier and Sciortino with both conspiracy to violate RICO and with a substantive RICO offense both partly based on the Farkas extortion. Therefore, their prior convictions on a RICO conspiracy charge, which contained the Farkas extortion, do not bar conviction for a substantive RICO violation based partly on the same Farkas extortion. *United States v. Solano*, 605 F.2d 1141, 1143 (9th Cir. 1979), *cert. denied, sub nom. England v. United States*, 444 U.S. 1020, 100 S.Ct. 677, 62 L.Ed.2d 652 (1980).

The double jeopardy challenge is rejected.

## II.

### THE 1975 PLEA AGREEMENT

Brooklier and Sciortino contend the 1975 plea agreement prevents the government from including the Farkas extortion in any subsequent indictment. The government, on the other hand, contends the plea agreement was limited to the abatement of pending and planned federal or state investigations and charges. The district court agreed with the government's interpretation of the plea agreement.

The findings of a district court on the meaning of a plea agreement are reviewable under the "clearly erroneous" standard. *United States v. Krasn*, 614 F.2d 1229, 1233 (9th Cir. 1980). We have examined the record and are of the opinion the district court's interpretation of the plea agreement is reasonable and is not clearly erroneous.

There is no merit to appellants' contention that the 1980 indictment should be dismissed because it was obtained in violation of the government's policy against multiple prosecutions for the same transactions. *Petite v. United States*, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960). The *Petite* doctrine relates to the Justice Department's internal position that successive indictments will not ordinarily be based on the same conduct in order to avoid unnecessary multiple prosecutions. Except in extraordinary circumstances, it is a policy not

reviewable by the courts. *United States v. Snell*, 592 F.2d 1083, 1087–88 (9th Cir.), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979); *United States v. Welch*, 572 F.2d 1359, 1360 (9th Cir.), *cert. denied*, 439 U.S. 842, 99 S.Ct. 133, 58 L.Ed.2d 140 (1978).

## III.

### VINDICTIVE PROSECUTION

The 1978 indictment, which did not mention the Farkas extortion, was dismissed on motion of the appellants because of voting irregularities in the grand jury. In the subsequent indictment, the Farkas extortion was added in Count 2.

Brooklier and Sciortino contend the addition of the Farkas extortion in the subsequent indictments violates the vindictiveness doctrine. The doctrine of presumed vindictiveness applies when the Government increases the severity of the charges against the defendant under circumstances that pose a "realistic or reasonable likelihood of prosecutorial conduct that would not have occurred but for hostility or a punitive animus towards the defendant because he has exercised his specific legal rights." *United States v. Gallegos-Curiel*, 681 F.2d 1164 at 1168–69 (9th Cir. 1982). Here, the 1978 indictment was replaced by an indictment containing fewer charges and lighter penalties. The vindictiveness doctrine does not apply. *United States v. Rosales-Lopez*, 617 F.2d 1349, 1357 (9th Cir. 1980).

Even if the addition of the Farkas extortion somehow subjected Brooklier and Sciortino to a greater risk of punishment, vindictiveness could not be presumed. No reasonable likelihood of vindictiveness arises when the prosecutor increases the charges prior to trial, because he "may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance." *United States v. Goodwin*, —— U.S. ——, 102 S.Ct. 2485, 73 L.Ed.2d 74

(1982). The prosecutor's initial charging decision should not freeze future conduct and the Government may reevaluate the societal interest in prosecution prior to trial, *id.*, 102 S.Ct. at 2493; *Gallegos-Curiel*, at 1169–71, especially when, as here, "the prosecutor is required by court order to obtain a new indictment" and thus "will *necessarily* have to review the evidence and reconsider what charges to present to the grand jury." *United States v. Banks*, 682 F.2d 841 at 845 (9th Cir. 1982) (emphasis in original). The district court correctly dismissed the appellants' vindictive prosecution claim.

## IV.

### DEFENDANTS' RIGHT TO TESTIFY

■ Brooklier and Sciortino contend the Farkas extortion charge precluded them from testifying in their own defense because their 1975 guilty pleas would have required them to admit their participation in the Farkas extortion based on the 1975 guilty plea.

This contention is incorrect. They accepted sentencing under *North Carolina v. Alford*, 400 U.S. 25, 37, 91 S.Ct. 160, 167, 27 L.Ed.2d 162 (1970), and did not admit their guilt. They only consented to the imposition of the penalty for that count. They could have testified to their reasons for entering into the 1975 plea agreement.

Appellants' decision not to risk cross-examination was purely tactical. Among other reasons, they wanted to avoid impeachment by evidence of prior convictions. "The constitution does not forbid every government-imposed choice in the criminal process that has the effect of discouraging constitutional rights." *Jenkins v. Anderson*, 447 U.S. 231, 236, 100 S.Ct. 2124, 2128, 65 L.Ed.2d 86 (1980).

· The Farkas extortion charge was properly included in the 1980 indictment.

## V.

### AMBIGUITY OF THE INDICTMENT

Appellants contend that Count 1 of the indictment, which charges defendants with a RICO conspiracy, contains ambiguous and legally impossible pleadings. They assert that the racketeering activities set forth in Count 1 include conspiracy charges, and that a "conspiracy to conspire" to commit acts of extortion is an illogical and ambiguous allegation.

■ The essence of a RICO conspiracy is not an agreement to commit racketeering acts, but an agreement to conduct or participate in the affairs of an enterprise through a pattern of racketeering. 18 U.S.C. § 1962(c); *United States v. Zemek*, 634 F.2d 1159, 1170 N.15 (9th Cir. 1980). A "pattern of racketeering activity" is expressly defined as at least two acts of racketeering activity. 18 U.S.C. § 1961(5).

Conspiracies or attempts can serve as the underlying racketeering activities because 18 U.S.C. § 1961(1)(B) defines "racketeering activity" as including those offenses indictable under 18 U.S.C. § 1951. Section 1951, in turn, makes punishable attempts or conspiracies to obstruct, delay, or affect commerce by robbery, extortion or physical violence.

■ Thus, the statutory language of sections 1962, 1961 and 1952 allows for the indictment as written. ·A series of conspiracies and failed attempts constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), even if no racketeering offense is completed. The district court in its instructions adequately explained these distinctions. In addition, appellants have failed to show that this so-called ambiguity has prejudiced them.

## VI.

### FAILURE TO DISMISS THE FOREX EXTORTION CHARGE

■ Count 4 charges the appellants with an attempt and conspiracy to extort money from Forex, the undercover business operated by FBI agents. The Forex activities are among the racketeering acts supporting the RICO violations in Counts 1 and 2.

Two of the Forex extortion payments were made in California and the third in Nevada. Appellants contend that the California payments provide no basis for federal jurisdiction under the Hobbs Act, 18 U.S.C. § 1951. They assert a lack of nexus with interstate commerce, because the FBI business was a fiction, and had no actual or potential effect on interstate commerce. They also contend that the Nevada payment did not meet jurisdictional requirements because the federal agents demanded payment in Nevada for the sole purpose of manufacturing jurisdiction.

Judge Pregerson, then a district judge, rejected these contentions on the ground that factual impossibility is no defense to an inchoate offense. *United States v. Brooklier*, 459 F.Supp. 476 (C.D.Cal.1978). His analysis has now been adopted by this court, *United States v. Bagnariol*, 665 F.2d 877, 895–96 (9th Cir. 1981), as. well as the Third Circuit in *United States v. Jannotti*, 673 F.2d 578, 592–94 (3d Cir. 1982) (en banc), *pet. for cert. filed*, —— U.S. ——, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982), which held that an actual potential effect on interstate commerce was not a jurisdictional prerequisite for a conviction of conspiracy to violate the Hobbs Act.

■ Appellants also contend that the federal agents "manufactured jurisdiction" by requiring payment in Nevada. They rely on *United States v. Archer*, 486 F.2d 670, 682 (2d Cir. 1973), in which agents placed telephone calls from another state in order to transform a local bribery into a federal crime. Here, both the appellants and federal agents engaged in activities of an interstate character. Jurisdiction had already been established by the nature of the activities themselves.

We hold there was sufficient nexus with interstate commerce to satisfy federal jurisdictional requirements.

VII.

DIVISIBILITY OF FOREX
EXTORTION PLAN

■ Defendants contend that the Forex extortion, consisting of three separate pay-ments, is really a single offense which the FBI extended over a period of time in order to satisfy the "pattern of racketeering" requirement under the RICO statute.

In *United States v. Tolub*, 309 F.2d 286, 289 (2d Cir. 1962), the court held that each acceptance of payment by the defendant during the period of an extortion scheme constituted a separate act of extortion. *See also, United States v. Addonizio*, 451 F.2d 49, 59–60 (3rd Cir.), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). Here, each payment resulted from appellants' initial threats in an ongoing extortion scheme and each payment was a separate act of racketeering within the meaning of 18 U.S.C. § 1961(1).

VIII.

ADMISSION OF DRAGNA'S ORAL
STATEMENTS

From 1969 until 1976, Dragna had a number of conversations with FBI Agent John Nance in which Nance attempted to develop Dragna as an informant. In 1976, Dragna was subpoenaed to appear before a federal grand jury. Dragna called Nance for help. Nance told Dragna that if he cooperated, their conversations might be kept confidential. The time for appearance was continued, but Dragna was not promised immunity. Dragna's statements during his conversations with Nance were admitted at trial.

■ To protect the voluntariness of a waiver of Fifth Amendment rights, the government must keep its promise of immunity. *Shotwell Manufacturing Co. v. United States*, 371 U.S. 341, 347, 83 S.Ct. 448, 453, 9 L.Ed.2d 357 (1963). However, the mere threat of a grand jury subpoena for failure to cooperate does not constitute an offer of immunity. Statements made in confidence are not immune absent an unconditional promise of confidentiality. *See Matter of Wellins*, 627 F.2d 969, 972 (9th Cir. 1980). The district court found that there was no binding agreement, and that the statements were admissible against Dragna. We agree.

■ Dragna's contention that he was deprived of his Fourth Amendment rights because the Grand Jury subpoena was a "ruse designed to cultivate him as an informant" has no merit. No evidence was offered to support this contention. *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the case Dragna cites in support of that contention, considered whether a confession is admissible when police took the defendant into custody, and detained and interrogated him when there was no probable cause to arrest. Here, there was no detention or custodial interrogation.

Dragna also asserts that the statements were involuntary because he was influenced by threats of a Grand Jury investigation and promises of confidentiality. The record shows that there was no coercion or threats, and that Dragna was warned to be careful of what he said. The methods used were constitutionally permissible.

### IX.

### BRUTON OBJECTIONS

Dragna, in his statement to Nance, admitted he was "acting" boss of the Los Angeles La Cosa Nostra family, and he named all the other appellants as members of the family. The names of the other appellants were deleted from his statement and the jury was instructed that Dragna's statement could only be considered against him.

Dragna did not testify. Nevertheless, through other witnesses, the jury learned Brooklier and Sciortino were in prison at the time. Brooklier and Sciortino contend that Dragna's statement that he was the acting boss compels the inference that he was acting in place of Brooklier and Sciortino, and that a severance was necessary under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

■ The district court properly denied the motion to sever. Even if the edited statement hinted that Brooklier and Sciortino were members of the Los Angeles family, this inference was not sufficiently incriminating to require severance, because both sides stipulated and told the jury that mere membership in La Cosa Nostra was not unlawful. Courts need not grant a *Bruton* severance unless the statements of the non-testifying defendant clearly inculpate his codefendants. *E.g., United States v. Knuckles*, 581 F.2d 305, 313 (2d Cir. 1978). As in *United States v. Wingate*, 520 F.2d 309, 314 (2d Cir. 1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976), it is "[o]nly when combined with considerable other evidence, which amply established [Brooklier and Sciortino's] guilt, [that] the statements tend to implicate [them]."

### X.

### ADMISSION OF FRATIANNO'S PLEA AGREEMENT

During the trial, defense counsel referred to government witness James Fratianno as a perjurer, paid informant, and murderer who escaped the death penalty by cooperating with the FBI, and whose book sales would be enhanced by a conviction. In rebuttal, the government introduced Fratianno's plea agreement, which required Fratianno to testify truthfully. Appellants contend that under *United States v. Roberts*, 618 F.2d 530 (9th Cir. 1980), this evidence permitted the government to improperly vouch for Fratianno's credibility.

■ Although, as the court in *Roberts* pointed out, plea agreements are admissible on the issue of bias, they are not to be used as a basis for supporting the truthfulness of the witness' testimony. In *Roberts*, the United States Attorney argued to the jury that a government witness testified truthfully because he was afraid of violating his plea agreement, and that the government, to ensure he would testify truthfully, placed a detective in court when the witness testified. We reversed the conviction primarily because the statement that the detective was monitoring the witness improperly referred to facts outside the record. Here, no such argument was made. In fact, whenever the plea agreement was mentioned during the trial, the

court cautioned the jury that the agreement requiring the witness to testify truthfully did not mean that the testimony was in fact truthful. The court also told the jury that the government could not vouch for the truth of the testimony and that the jurors were the sole and exclusive judges of the credibility of all witnesses. These instructions adequately dispelled any suggestion of vouching.

## XI.

## STURMAN EXTORTION: UNCORROBORATED ACCOMPLICE TESTIMONY

■ Appellants contend Fratianno's testimony was insufficient as a matter of law for the jury to find that the appellants attempted to extort money from Reuben Sturman, because Fratianno was an accomplice and his testimony was uncorroborated. Fratianno testified at length on many subjects and he was thoroughly cross-examined. His testimony in other areas was corroborated in many details. There was adequate evidence to satisfy the rule of *United States v. Sigal*, 572 F.2d 1320, 1324 (9th Cir. 1978), that the uncorroborated testimony of an accomplice is sufficient to support a conviction so long as it is not incredible or unsubstantial on its face.

We hold Fratianno's testimony meets this standard and is adequate to support the RICO convictions based on the Sturman extortion charge.

## XII.

## ADMISSIBILITY OF CO–CONSPIRATOR STATEMENTS

Fratianno testified he told Tony Delsanter and Leo Moceri that Brooklier and Sciortino wanted them to extort money from Reuben Sturman, a dealer in pornography. Fratianno also testified that Delsanter later reported that he and Moceri had done the job. Delsanter introduced Fratianno to Glenn Pauley, the man who had "grabbed" Sturman. This testimony was the only link connecting Brooklier and Sciortino to the Sturman extortion attempt. Neither Delsanter nor Moceri testified.

Brooklier and Sciortino contend that the statements made by Delsanter and Moceri were inadmissible hearsay because the co-conspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E), requires the declarant's involvement in the conspiracy to be corroborated by independent evidence. *United States v. Snow*, 521 F.2d 730, 733 (9th Cir. 1975).

■ Once the conspiracy was shown to exist, only slight evidence was required to support a finding that Delsanter and Moceri were part of the conspiracy. *United States v. Calaway*, 524 F.2d 609, 612 (9th Cir. 1975).

■ Here, there was ample evidence that a conspiracy did exist and that Dragna, Brooklier, Sciortino, Frantianno and others were members of it. Fratianno testified that Brooklier and Sciortino, with the approval of Dragna, the top man, directed Fratianno to go to Cleveland, meet with Delsanter and Moceri, and get them to arrange to shake down Sturman. Fratianno testified that he went to Cleveland and met with Delsanter and Moceri and brought them the message. Thereafter, they told Fratianno that they had done the job through Glenn Pauley, to whom they introduced Fratianno. Sturman later identified Glenn Pauley as the man who attempted to extort money from him.

In determining whether Delsanter and Moceri were part of the conspiracy, we treat testimony on their statements as independent evidence of their participation. We consider their statements not for their truth, but as verbal acts to show involvement. *Calaway*, 524 F.2d at 613. The court in *Calaway*, after setting forth the test for admissibility of hearsay statements of co-conspirators, stated:

In considering this question, we treat testimony by witnesses about statements made by [the alleged conspirators] as part of the independent evidence of their participation in the conspiracy. Such statements by them are not received to establish the truth of what they said, but to show their own verbal acts.

Delsanter's statement indicates that he and Moceri were aware of the scope and purpose of the extortion conspiracy, and that they agreed with those goals. This evidence is sufficient to link Delsanter and Moceri to the conspiracy.

The district court correctly admitted the statements of Delsanter and Moceri under the co-conspirator exception to the hearsay rule.

### XIII.

### COUNTS 1 & 2: SUFFICIENCY OF EVIDENCE TO CONVICT DRAGNA

Dragna argues that there was insufficient evidence to connect him to the Sturman and Forex extortions. He points out that the jury acquitted him on the Gaswirth extortion and on the obstruction of justice charges. He argues that this leaves no underlying racketeering acts for his RICO convictions.

■ Inconsistent verdicts do not require reversal unless there is insufficient evidence to sustain the guilty verdict. *United States v. McCall*, 592 F.2d 1066, 1068 (9th Cir. 1979); *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932).

■ The evidence was sufficient to convict Dragna on both the RICO conspiracy and RICO substantive counts. The evidence showed that Fratianno acted as Dragna's agent in making arrangements for the Forex extortions. Dragna retained ultimate control over the Los Angeles La Cosa Nostra and he instructed Frank Bompensiero to make money for the family. He planned and agreed to Bompensiero's murder and he approved of the plans to shake down Sturman and Gaswirth. Dragna was to benefit from all of these operations.

Considered in the light most favorable to the verdict, the evidence and the inferences drawn from the evidence were sufficient to sustain Dragna's convictions on both counts. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

### XIV.

### SUFFICIENCY OF EVIDENCE TO CONVICT BROOKLIER AND SCIORTINO

Brooklier and Sciortino contend that their convictions under Count 2, a substantive RICO count, must be reversed because there was insufficient evidence of their involvement in the Forex extortions. The United States Attorney, in his closing argument, conceded that Brooklier and Sciortino were not involved in those extortions.

In *United States v. Brown*, 583 F.2d 659 (3d Cir. 1978), the court held a RICO conviction which is based on the same act upon which a non-RICO substantive count is based, must be reversed if the conviction on that substantive count is reversed. The court reasoned that this result is necessary because it would be impossible to determine whether the jury relied on an impermissible underlying offense to reach its verdict on the RICO count.

■ However, in this case, even if the evidence of the Forex extortion was insufficient, the error in allowing the charges to go to the jury along with the other four charges of extortion was harmless beyond a reasonable doubt. It is harmless because the United States Attorney told the jury that Brooklier and Sciortino were not involved in the Forex extortions and that the Forex extortions should not be considered in determining the guilt or innocence of Brooklier and Sciortino.

■ Brooklier also contends that his acquittals on other counts compel the conclusion that the jury relied solely on the Sturman extortion in convicting him on the RICO conspiracy count. Although at least two acts of racketeering are necessary to convict a defendant of a substantive RICO offense, it is unnecessary in a conspiracy to commit RICO to show that a particular defendant personally committed any act of racketeering.[6] We, therefore, hold that the

---

**6.** For an excellent discussion of this issue, see the statement of Chief Judge Owen in *United*

*States v. Hawkins*, 516 F.Supp. 1204, 1208 (M.D.Ga.1981).

conviction of Brooklier on the conspiracy count (Count 1) must be affirmed regardless of whether he personally committed any act of racketeering, even though we find that the evidence amply supports a finding that Brooklier did, in fact, commit at least two acts of racketeering.

Appellants also contend that the district court erred in denying their Rule 14 pretrial severance motion because Brooklier, Sciortino and Dragna were not charged under Count 4, the Forex extortion count. This contention has no merit. The Forex extortion evidence was relevant because Brooklier and Sciortino remained members of La Cosa Nostra during the time the Forex extortions were committed by co-conspirators. It was also relevant because the Forex extortion activity became the motive for killing Bompensiero, an act for which Brooklier and Sciortino were indicted in Count 5.

We therefore reject the contention of Brooklier and Sciortino that their convictions must be reversed for lack of sufficient admissible evidence to convict. We also hold that the district court did not abuse its discretion in denying the severance motion.

### XV.

### ELECTRONIC SURVEILLANCE: REQUIREMENT OF A SUPPRESSION HEARING

Before trial, Brooklier moved to suppress a tape recording of his conversation with Fratianno on an extortion plan. Brooklier contends that the court order authorizing the electronic surveillance was issued on the basis of an affidavit which failed to set forth a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed," as required by 18 U.S.C. § 2518(1)(c).

Brooklier asserts that Fratianno was a paid government informant who could have infiltrated the individuals under investigation, and that electronic surveillance was therefore unnecessary. He further asserts that the government's application for the surveillance failed to include the fact that Fratianno was a paid informant.

The district court, without holding a hearing, denied Brooklier's motions to suppress. The tape was played to the jury.

The government contends that there was no need to set forth the information about Fratianno because when the conversation with Brooklier was taped, Fratianno was still under investigation. He did not become fully cooperative until later.

The fact that the government doubted whether Fratianno was fully cooperative did not relieve it of the obligation to set forth those facts. It was for the court to determine its materiality.

In *Franks v. Delaware*, 438 U.S. 154, 155–6, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978), the Supreme Court held:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

The court also held that if the hearing showed the false statement to be material, the evidence must be suppressed.

In *Franks*, a search warrant was issued based on an affidavit containing deliberate misstatements. Here, although the problem is one of omission rather than misstatement, the initial burden for purposes of obtaining a hearing remains on the defendant. The defendant must show that the omission was deliberate or made in bad faith. Brooklier has demonstrated no more than negligence on the Government's part. Mere negligence in preparing the affidavit for a wiretap order is not sufficient to suppress the evidence obtained. *Id.* at 170, 98 S.Ct. at 2683.

Although the government should have included information required by the

wiretap statute, 18 U.S.C. § 2518(1)(c), we hold the district court, in failing to hold a hearing and in admitting the tape in evidence, did not commit error because there was no evidence of deliberate omission in the government's affidavit.

## XVI.

### JURY INSTRUCTIONS

Appellants contend that the jury was improperly instructed on the elements of a conspiracy to commit RICO. They assert that the jury was instructed to convict if they found multiple conspiracies to commit two or more acts of racketeering even though no overall conspiracy existed.

The instructions which the court gave on this issue were jointly drafted by counsel for both the government and the appellants. Later, in response to a question from the jury, appellants objected to a clarifying instruction proposed by the government. They asked that no additional instructions be given because the previous instruction, based on a Blackmar & Devitt instruction, was clearer than the tendered one, and had "proved to be true and useful over the years." Later, the court, in response to another inquiry from the jury, told them:

Each individual has to have knowledge of two or more racketeering acts and been a part of and committed those, and as part of those it could be conspiracies to commit those racketeering acts.

Although the instructions on this issue were not models of clarity, any ambiguity was harmless to appellants and actually favored them.

The purpose of the RICO statute is to allow a single prosecution of persons who engage in a series of criminal acts for an enterprise, even if different defendants perform different tasks or participate in separate acts of racketeering. The same persons need not commit or endorse the same acts of racketeering. It is sufficient if a defendant who participates in an enterprise through a pattern of racketeering knows that the enterprise operates by a pattern of racketeering. The pattern may be estab-lished by showing two or more acts that constitute offenses, conspiracies, or attempts of the requisite type, as long as the defendant committed two of the acts and both of them were connected by a common scheme, plan or motive.

 In addition, it is a crime to conspire to commit the substantive RICO offense. 18 U.S.C.A. § 1962(d) (Supp.1982). This overall conspiracy requires the assent of each defendant who is charged, although it is not necessary that each conspirator knows all of the details of the plan or conspiracy. *United States v. Elliott*, 571 F.2d 880, 900–05 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978).

 Conspiracy to carry on an enterprise through racketeering, section 1962(d), is a separate crime from the participation in an enterprise through racketeering acts such as conspiracy or attempts, section 1962(c). The distinction between a conspiracy to violate the RICO statute, and a conspiracy or attempt committed as part of a pattern of racketeering activity, depends on the time the conspiracy is formed and its objective. If the agreement or combination is undertaken to establish or participate in an enterprise and to do it through a pattern of racketeering, there is a conspiracy to commit the underlying RICO offense. If the enterprise is in existence and it is aided by attempts or conspiracies of the kind proscribed by the statute, such attempts or conspiracies may be part of the pattern of racketeering.

 The instructions given here required each defendant to agree to participate in two specific racketeering acts, even on Count 1. The term "enterprise" was defined and the jury told that they must find each defendant was employed by or associated with a racketeering enterprise, and that the racketeering offenses were connected by a common scheme, plan, or motive so as to constitute a pattern "and not merely a series of disconnected acts." They were also told they must find "through the commission of two or more connected offenses the defendant conducted

or participated in the conduct of the enterprise." These instructions were adequate to inform the jury of the elements of a RICO conspiracy, and required them to find an overall conspiracy to conduct an enterprise through a pattern of racketeering activity before they could find appellants guilty.

To the extent the trial court's instructions can be interpreted to require that each defendant actually participate in two or more acts of racketeering in order to be guilty of conspiracy to violate RICO under section 1962(d), the instructions posed an unnecessary burden on the Government that in no way prejudiced the appellants.

There is no merit in appellants' contention.

## XVII.

### JURY SELECTION

██ Before trial, appellants sought to excuse for cause four jurors who on voir dire stated they believed there existed an organization known as La Cosa Nostra whose members are engaged in organized crime. Appellants later exhausted all of their peremptory challenges, many of which were exercised against jurors who had no opinions about La Cosa Nostra. We reject the government's contention that this fact prevents appellants from challenging the district court's ruling. The defendants need not show actual prejudice. *Swain v. Alabama*, 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965). Any error which impairs the exercise of peremptory challenges is reversible error. *United States v. Turner*, 558 F.2d 535, 538 (9th Cir. 1977).

██ Jurors need not be totally ignorant of the facts and issues involved. *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1960). The court in *Irvin* noted:

In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. [citations omitted]

Here, each of the jurors stated that he did not have an opinion on the guilt or innocence of the defendants, that he would keep an open mind, and that he would listen to the evidence on both sides and follow the court's instructions. They also said that they would then decide whether La Cosa Nostra exists, whether it operates in Los Angeles, and whether the defendants were members of it. On the basis of the evidence and the instructions, they would then decide whether each defendant was guilty of an offense charged in the indictment.

██ The trial court has broad discretion in its rulings on challenges for cause, and can only be reversed for an abuse of discretion. *Dennis v. United States*, 339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734 (1949). In *Dennis*, the Supreme Court affirmed the conviction of an admitted communist by a jury composed of government employees during a period of widespread anticommunist hysteria. Here, both sides stipulated to the jury that membership in La Cosa Nostra is not a crime. The jury was told that the government had the burden of proving that each appellant was knowingly associated with an enterprise engaged in a pattern of racketeering activity. No juror expressed an opinion before trial on whether any appellant was a member of La Cosa Nostra, or was guilty of any illegal act.

The district court did not abuse its discretion in refusing to dismiss the four jurors for cause.

AFFIRMED.